Anthony O. Egbase, Esq. SB#181721
Law Offices of Anthony O. Egbase & Associates
350 S. Figueroa Street, Suite 189
Los Angeles, CA 90071
Tel: (213) 620-7070; Fax: (213) 620-1200

Attorney for Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br><br>CORONA DERMATOLOGY CENTER, INC.<br><br>Debtor-in-Possession | CASE #: 8:10-bk-19210<br>Chapter 11<br><br>**EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO MAINTAIN EXISTING CASH-MANAGEMENT SYSTEM AND CERTAIN PREPETITION BANK ACCOUNTS;**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing:<br><br>Date: July 9, 2010<br><br>Time: 1:30 p.m.<br><br>Place: Courtroom 5D<br>411 West Fourth Street<br>Santa Ana, CA 92701-4593 |

TO THE HONORABLE ROBERT NK. KWAN, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE;

THE DEBTOR'S TWENTY LARGEST UNSECURED CREDITORS; THE DEBTOR'S SECURED CREDITORS; AND ALL OTHER PARTIES ENTITLED TO NOTICE:

Corona Dermatology Center, Inc., the above-captioned debtor and debtor in possession ("Debtor" or the "Debtor in possession"), hereby moves this Court on an emergency basis for entry of an order:

1. Authorizing Debtor, in its discretion, to maintain and continue to use its prepetition cash management system, which includes maintaining certain bank accounts at Wells Fargo Bank, N.A. ("Wells Fargo");

2. Without limiting the generality of the foregoing, authorizing Debtor to leave open its prepetition bank accounts at Wells Fargo, subject to certain proposed conditions described in the annexed Memorandum of Points and Authorities;

3. Directing Wells Fargo and any and all other financial institutions receiving or transferring funds from the Debtor's operations, to cooperate with respect to Debtor's efforts to maintain and use its cash management system and accounts consistent with the relief sought herein; and

4. Granting an interim and final waiver of section 345 of the Bankruptcy Code. Debtor respectfully submits that the foregoing relief is necessary and appropriate to ensure as smooth a transition into chapter 11 as possible, and to avoid the operational and administrative paralysis that would likely result if Debtor were required to immediately close all of its existing bank accounts and rebuild its cash management system.

This Motion is supported by the annexed Memorandum of Points and Authorities and the Declaration of Jonathan Ledesma in Support of Emergency First-Day Motions ("Ledesma Declaration") filed concurrently herewith.

Pursuant to LBR 9075-1(a), this Motion may be heard on an emergency basis. Debtor respectfully requests that the Court schedule a hearing on this Motion at the same time as other first day motions, to avoid disruption of Debtor's operations.

WHEREFORE, based on this Motion, the annexed Memorandum of Points and Authorities, and the Lane Declaration, Debtor respectfully requests that the Court grant this Motion and enter an order approving Debtor's continued use of its existing cash management system and bank accounts to the extent requested herein.

DATED: July 6, 2010

/s/ Anthony O. Egbase

Anthony O. Egbase
Proposed Reorganization Counsel for
Debtor and Debtor in Possession

EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO MAINTAIN EXISTING CASH-MANAGEMENT SYSTEM AND CERTAIN PREPETITION BANK ACCOUNTS

# MEMORANDUM OF POINTS AND AUTHORITIES

I.

## BACKGROUND FACTS

Corona Dermatology Center, Inc. (Debtor) is a duly organized California Corporation. The Debtor is a medical cosmetic dermatology treatment clinic that provides specialized services in Dermatological procedures. The Debtor is and affiliated of California Dermatology Center, Inc. (CDC). The Debtor uses an advanced and most technological treatment procedure that enables it to perform Dermatological surgical procedures without the need of invasive procedures and extensive healing time.

From its inception in, the Debtor experienced robust and steady growth due to the high demands of its services, within a few years the Debtor's business expanded to having 7 different facilities within Los Angeles County, Orange County and San Bernardino County, in order to efficiently to carter to the demands for its services.

As a medical services provider, the Debtor has been plague with complicated billing systems and strict authorization requirements of the healthcare industry. These have resulted to delays in payment, and sometimes nonpayment for Debtor's services. In December 2006, the Debtor commenced a civil action against United Healthcare for failure to pay for services provided to United Healthcare insured by the Debtor. United Healthcare claiming that the Debtor inappropriately billed their insured for certain medical services, in turn filed a civil action against Debtor These legal actions pending in the civil courts have compounded the financial woes of the Debtor, as the Debtor's Legal expenses and fees became by far the largest single component of the Debtor's expenses and have depleted the Debtor's ordinary income to a net loss.

Additional information on Debtor and the events leading up to this case are set forth in the Ledesma Declaration in support of First Day Motions concurrently filed herewith.

**B. The Prepetition Cash Management System.**

Debtor uses certain bank account at Wells Fargo Bank, N.A. ("Wells Fargo") to manage its cash flow. This cash management system is similar to the cash management systems commonly employed by other hospitals and health care facilities comparable to Debtor in size and complexity. The widespread use of such a system is attributable to the numerous benefits it provides. Among the most important of these benefits are: (1) the ability to ensure tight control over corporate funds and cash availability; (2) the reduction of administrative expenses; and (3) the ability to provide timely and accurate presentations of account balances.

Debtor's cash-management system handles average cash receipts and disbursements of approximately $190,000 every month. This system enables Debtor to transfer funds expeditiously, and to obtain ongoing balance reporting in a timely manner. Debtor does not believe that it is possible to generate this information manually. Accordingly, without access to its existing cash-management system, Debtor would be unable to generate essential financial information until it could replicate such system. Moreover, during any type of transition period, the increased costs and delays that Debtor's patients, payors, and vendors would experience while attempting to transact business with Debtor could significantly harm Debtor's goodwill and hinder its chapter 11 efforts.

The major components of Debtor's cash-management system have been in place for almost two years and the system represents Debtor's ordinary, usual, and essential business

practice. Debtor's operations require that it maintain its cash-management system essentially intact. While it may be necessary to make some modifications to the cash- Management system to reflect the requirements of chapter 11, any undue disruption could jeopardize the Debtor's operations.

The principal components of the Debtor's cash management system are described as follows:

The patients, insurance payors, and government agencies remit payments to Debtor via cash, check, ACH transfer and wire transfer. Patients also may authorize Debtor to collect payments from certain credit card companies, including Visa, Mastercard and American Express. These payments are deposited into the Debtor's and its subsidiaries General Account, depending on which facility provides the service. In addition to being its primary accounts payable account, Debtor funds all its business expenses except payroll from this account. Since Debtor has a central payroll system for its company and subsidiary companies, the Debtor and affiliates transfer funds from these General Accounts to fund the Payroll account.

1. **The General Accounts.**

Debtor maintains a general account at Wells Fargo, Account no. XXXXXX1754. This accounts receives a daily influx of cash checks, credit card funds and wire transfers from government and non-governmental sources, including patients, managed care providers, and insurance payors. There is a two to three day delay in receipt of funds from credit card companies. Debtor normally writes checks or makes electronic payments from these account to handle all the Debtor's business operations and advances to medical supply companies to cover

expenditures. Debtor is requesting authority to maintain this accounts as a means of collecting funds and compensation for its services and as an accounting and cash-management tool.

Debtor shall direct Wells Fargo Bank to stop payment of all checks issued prepetition against the Debtor Disbursement Account. The Debtor is able to isolate and identify these checks using the list of checks it sends to Wells Fargo with its check run each week. The Debtor has reviewed past lists to determine which checks have cleared, and will provide Wells Fargo Bank with a list of checks for which it should stop payment.

The Debtor will maintain this practice going forward, to ensure that prepetition checks issued against the Debtors General Account are not honored. Subject to these stop payment orders, the Debtor is requesting that it be permitted to maintain the Debtors General Account and the Payroll Disbursement Account at its discretion.

The Debtor respectfully submits that in light of the control it is able to exercise over these accounts, and the aforementioned stop payment orders, it will be able to halt the payment of any prepetition checks drawn on these accounts (except as this Court otherwise authorizes), and feasibly account for checks issued postpetition on same, with a minimum of administrative burden.

C. **Continuation of the Debtor's Cash Management System, with Certain Modifications, Is Essential to the Debtor's Ongoing Operations.**

Maintaining the Debtor's bank accounts and cash-management system will not interfere with the performance of the Debtor's duties as a debtor in possession—including its obligation to segregate and separately account for prepetition and postpetition financial activities—and as a result, will not prejudice any party in interest.

EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO MAINTAIN EXISTING CASH-MANAGEMENT SYSTEM AND CERTAIN PREPETITION BANK ACCOUNTS

The Debtor will authorize only checks related to prepetition obligations that this Court authorizes Debtor to clear.) In addition, Debtor shall order new "debtor in possession" check stock. Until the new stock arrives, Debtor will continue to use its existing check stock, but will stamp each post-petition check with the words "debtor in possession," so that vendors and trade creditors will be on notice of Debtor's bankruptcy.

Finally, in accordance with the guidelines promulgated by the Office of the United States Trustee, Debtor is in the process of closing its books and records and opening new books and records for the postpetition period. These measures are reasonable and sufficient to ensure that Debtor separately accounts for its postpetition financial activities.

If the Debtor is not immediately authorized to continue using its cash-management system (as modified), the Debtor's health care operations may suffer immediate, and will be severely disrupted. First, closing all of the accounts used by Debtor would effectively destroy a complex and carefully tailored cash-management system that handles Debtors monthly cash flow and could result in severe cash shortages during the early stages of this case. Second, it would be difficult, costly, and time-consuming for the Debtor's management to open new accounts in an attempt to replicate the existing cash management system. Finally, due to the bureaucratic process involved in setting up account for electronic payments with the governmental and insurance payors, and credit card companies, the Debtor's patients, employees, health care providers, insurance payors, and vendors would inevitably face delays and confusion engendered by the transition to a new cash-management system.

II.

## DICUSSION

Courts commonly have approved the continuation of existing cash-management systems, related procedures and transactions employed in the ordinary course of a debtor's business.

For example, the bankruptcy court in, In re The Charter Co., 778 F.2d 617, 620 (11th Cir.1985), authorized the debtor and its subsidiaries "'to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors. . . .'" Id.; see also In re Columbia Gas Sys., Inc., 997 F.2d 1039, 1053 (3d Cir. Del. 1993) (noting that the debtor "employed a combined cash management system and utilized all of its cash without restriction" and that "[t]his pooling of funds promoted efficient utilization of cash resources."); In re UNR Indus., Inc., 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984) (debtors "utilize[d] a court-approved and common cash management system").

Similarly, debtors have been permitted to use certain of their prepetition bank accounts as part of their postpetition cash-management systems. See, e.g., In re Grant Broadcasting, Inc., 75 B.R. 819, 820 (E.D. Pa. 1987) (referring to order authorizing use of cash collateral and prepetition bank accounts pursuant to Bankruptcy Code section 363); In re New York City Shoes, Inc., 78 B.R. 426, 427 (Bankr. E.D. Pa. 1987) (debtor depositing postpetition funds into prepetition bank accounts).

If the Debtor is forced to close its current bank accounts, there will be disruption and confusion that would negatively impact its operations. For instance, funds from governmental payors and insurance companies could be deposited into the wrong account, misapplied, held in limbo, or otherwise delayed, the Debtor may not have the ability to make

timely payments for its medical supplies, wages and other necessary expenses required to operate its business thus paralyzing the Debtor's ability to operate the business and provide quality care to patients.

The Debtor's transition into chapter 11 will be significantly smoother, however, if following the commencement of this case, its bank accounts are maintained with the same account numbers and, where applicable, automated relationships. Moreover, avoiding the disruption and delay to the Debtor's operations that would result absent the relief requested in the Motion will benefit parties in interest that may already be burdened by the Debtor's chapter 11 filing, including patients, employees, payors, and vendors, and will allow the Debtor to focus on implementing its reorganization strategies.

### III. WAIVER OF SECTION 345 REQUIREMENTS IS WARRANTED

Debtor seeks a waiver of Bankruptcy Code section 345(b), thereby permitting it to maintain its bank accounts without the need to post a bond or other security to the extent funds deposited in Debtor's bank accounts at any one time exceed the limitations of section 345.

Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the United States Trustee for the relevant district or the deposit of securities of the kind specified in 31 U.S.C. § 9303. See 11 U.S.C. § 345(b). Section 345(b)

provides further, however, that a bankruptcy court may allow alternatives to these approved investment practices "for cause." Id.

In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

a. The sophistication of the debtor's business;

b. The size of the debtor's business operations;

c. The amount of investments involved;

d. The ratings (Moody's and Standard and Poor) of the financial institutions where the debtor in possession funds are held;

e. The complexity of the case;

f. The safeguards in place within the debtor's own business of insuring the safety of the funds;

g. The debtor's ability to reorganize in the face of a failure of one or more of the Financial institutions;

h. The benefit to the debtor;

i. The harm, if any, to the estate; and

j. The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

In re Service Merchandise Company, Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999). While Debtor possesses its Account at Wells Fargo, in light of the amount of funds that will flow through its estate, it would be unnecessary and wasteful for Debtor to incur the expense of obtaining a bond given the safeguards embedded in its cash management system.

Debtor submits that its current practices provide sufficient protection for its cash and that it would be in the estate's best interest for Debtor to continue with these practices.

Moreover, Wells Fargo Bank is a well-known and fiscally strong institution, which provides services critical to the Debtor's operations. For these reasons, Debtor requests that this Court's order provide a waiver of the provisions of section 345 of the Bankruptcy Code and allow Debtor its Account.

IV.

CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion and enter an order approving the Debtor's continued use of its existing cash-management system and bank accounts to the extent set forth herein and in the Motion.

DATED: July 6, 2010

/s/ Anthony O. Egbase,

Anthony O. Egbase
Law Offices of Anthony Egbase & Associates
Proposed Reorganization Counsel for Debtor and

EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO MAINTAIN EXISTING
CASH-MANAGEMENT SYSTEM AND CERTAIN PREPETITION BANK ACCOUNTS

12